# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
devices recovered from a 2013 Chevy Traverse

Case No. 26-938M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before May 12, 2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 10/24/2026.

Date and time issued: 4/29/2026 @ 3:12 p.m.

[signature: Nancy Joseph]
*Judge's signature*

City and state: Milwaukee, WI

Honroable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

The property to be searched is described as follows: an "Blu" Products flip phone currently listed under Milwaukee FBI Inventory No. 1B125, hereinafter referred to as the **TARGET DEVICE # 1**, and a Black iPhone smartphone, currently listed under Milwaukee FBI Inventory No. 1B126, hereinafter referred to as the **TARGET DEVICE # 2**.

**TARGET DEVICE** #1 and **TARGET DEVICE #2** are currently located at the Federal Bureau of Investigation Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in the Eastern District of Wisconsin. This warrant authorizes the forensic examination of **TARGET DEVICE** #1 and **TARGET DEVICE #2** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the **TARGET DEVICE #1** and **TARGET DEVICE #2**, described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1) (i.e., the Subject Offenses), and involve Quentin FERGUSON, including, but not limited to:

a. any documents and communications related to the Subject Offenses;

b. lists of contacts and related identifying information;

c. any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel;

e. all bank records, checks, credit card bills, account information, and other financial records;

f. photographs and/or videos depicting evidence of the Subject Offenses;

g. any evidence related to either the ownership, purchase, or possession of items used in the Subject Offenses;

h. records of internet activity, including browser history, search terms that the user entered into any internet search engine, and records of user-typed web addresses

2. Evidence of user attribution showing who used or owned **TARGET DEVICE #1** and **TARGET DEVICE #2** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of
*(Briefly describe the property to be searched or identify the person by name and address)*
devices recovered from a 2013 Chevy Traverse

Case No. 26-938M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841; 843; 846 | Distribution of controlled substances; possession of controlled substances with the intent to distribute; unlawful use of a communication facility; conspiracy to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of 180 days *(give exact ending date if more than 30 days:* 10/24/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI TFO Miguel Ortega
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4/29/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR SEARCH WARRANT</u>**

I, Miguel Ortega, being first duly sworn on oath, on information and belief state:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am employed as a Police Officer through the Milwaukee Police Department and have been so employed for over twelve (12) years. I was previously assigned to the Milwaukee Police Department's District No. 7 Anti-Gang Unit involved in the investigation of offenses mostly involving, but not limited to narcotics, narcotics trafficking as well as the investigation of individuals prohibited from the possession of firearms within the City of Milwaukee. I am currently assigned as a Federally Deputized Task Force Officer with the Federal Bureau of Investigation's Milwaukee Area Safe Streets Task Force (MASSTF), a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including narcotics trafficking and conspiracy to possess narcotics with intent to distribute, as defined under Title 21 of the United States code, since April of 2020.

3. As a law enforcement officer and federal task force officer, I have participated in numerous narcotics investigations which involved violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (possession with intent to distribute a controlled substance, unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance, and conspiracy

to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous drug-trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a. I have used informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c. I have participated in several search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g. I know that drug traffickers commonly have in their possession, and at their residences and other storage locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials;

i. I know drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

j. I know drug traffickers maintain on-hand large amounts of U.S. currency to maintain and finance their ongoing drug business;

k. I know drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

l. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

m. I know it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses, or other locations over which they maintain dominion and control;

n. I know drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

o. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

p. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization; and

q. I know drug traffickers take (or cause to be taken) and maintain photographs of themselves, their associates, their property, and their drugs.

4. This affidavit is based upon my personal knowledge, training, and experience, and on information reported to me by other federal, state, and local law enforcement officers in the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon official records, witness statements, recorded statements, surveillance, and public records, which I consider to be reliable as set forth herein. Throughout this affidavit, reference will be made to case agents and/or investigators. Case agents and/or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. I have participated in several narcotics and firearms trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

6. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize

computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance), 843(b) (Unlawful Use of a Communication Facility [including the mails] to Facilitate the Distribution of a Controlled Substance), and 846 (Conspiracy to Distribute and Possession with the Intent to Distribute Controlled Substances) have been committed by Quentin FERGUSON (DOB: XX/XX/ 1986).

8. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated. See 18 U.S.C. § 2711(3)(A)(i).

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

9. The property to be searched is described as follows: an "Blu" Products flip phone currently listed under Milwaukee FBI Inventory No. 1B125, hereinafter referred to as the **TARGET DEVICE # 1**, and a Black iPhone smartphone, currently listed under Milwaukee FBI Inventory No. 1B126, hereinafter referred to as the **TARGET DEVICE # 2**.

10. **TARGET DEVICE** #1 and **TARGET DEVICE #2** are currently located at the Federal Bureau of Investigation Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in the Eastern District of Wisconsin. This warrant authorizes the forensic examination of **TARGET DEVICE** #1 and **TARGET DEVICE #2** for the purpose of identifying the electronically stored information described in Attachment B.

## PROBABLE CAUSE

*Background*

11. Information about Quentin FERGUSON and his illicit activities comes from the following sources and criminal indices: observations made during physical and static electronic surveillance, interviews conducted with a confidential human source, information obtained from other law enforcement officers, a garbage search, and a controlled evidence purchase. Quentin FERGUSON is a mid-level heroin and firearm dealer, who is believed to source his product from a variety of high-level narcotics traffickers operating in Milwaukee, Wisconsin. FERGUSON routinely distributes these drugs as well as traffics firearms in the Eastern District of Wisconsin and he has used, among other cellular devices, a device assigned call number (414) 491-0916 (hereinafter Telephone 1) to plan, coordinate, and conduct his illicit transactions.

## SOURCE OF INFORMATION

12. In 2025, case agents received information concerning Quentin FERGUSON's illegal drug trafficking and prohibited possession of weapons. Specifically, in March of 2025, a Confidential Human Source (CHS1) advised case agents that FERGUSON was a dealer of heroin and a firearms trafficker. CHS1 advised FERGUSON charges approximately $60.00 in US currency per gram of heroin. CHS1 advised FERGUSON was in possession of two Glock 10mm firearms equipped with machine conversion devices. CHS1 then advised case agents FERGUSON is charging approximately $2000.00 in US currency per pistol. CHS advised he/she was inside of FERGUSON's residence during the month of March 2025 and observed approximately 1,000 grams of heroin, 3 firearms equipped with machine conversion devices, and 4 Draco style pistol rifles. During this time, FERGUSON resided at the address of 5360 N. 38th St. Milwaukee, Wisconsin. CHS1 advised FERGUSON operates a red in color Ford Flex and

lives in a single-family residence near 35th-38th St. and W. Villard Av. Case agents conducted a check in law enforcement records which case agents were able to locate a Milwaukee Police Department booking photo of FERGUSON. The case agents then provided CHS1 with the booking photograph, in which the CHS1 confirmed FERGUSON's identity. Case agents conducted a check in law enforcement records, which revealed an address of 5360 N. 38th St. Milwaukee, Wisconsin, which is associated with FERGUSON. On Monday March 10th, 2025, case agents conducted a spot check at the address of 5360 N. 38th St. and observed a red in color 2013 Ford Flex bearing Wisconsin registration plate [ASH4529] parked in the rear driveway of the residence.

13. Your Affiant believes that CHS1 is credible. CHS1 has been extensively questioned by your Affiant, federal law enforcement officials, and local law enforcement officials within Wisconsin as to other individuals whom your Affiant is currently investigating and who are involved in drug trafficking and the prohibited possession of weapons.

14. CHS1's information is consistent with your Affiant's knowledge of FERGUSON. Furthermore, a substantial portion of the CHS1's information has been corroborated through independent investigation, information and evidence through oral and written reports, court ordered documents, physical and electronic surveillance, public records, and consensually recorded meetings and calls. CHS1 is a convicted felon with more than 4 felony convictions. CHS1 is cooperating with law enforcement for consideration for a pending federal case. For these reasons, your Affiant believes CHS1 to be reliable.

**FACTS ESTABLISHING PROBABLE CAUSE**

15. MASSTF subsequently opened an investigation into Quentin FERGUSON, who case agents have learned is a suspected member of the Gangster Disciples street gang. During

the course of the investigation, case agents have gained information and evidence through oral and written reports, physical and electronic surveillance, public records, and consensually recorded meetings and calls. Through these investigative techniques, case agents determined FERGUSON was engaged in narcotics firearm trafficking. Specifically, MASSTF conducted a controlled narcotics purchase and a controlled firearm purchase from FERGUSON utilizing CHS1.

**Controlled Purchase of Heroin/Fentanyl and Firearm – April 14, 2025**

16. On April 14, 2025, CHS1, under the direction of MASSTF, conducted a controlled buy of 25 grams of heroin and a rifle from Quentin FERGUSON (DOB: XX/XX/1986). On Monday April 14, 2025, case agents met with CHS1 at a pre-determined location. Case agents conducted a search of CHS1 and CHS1's vehicle with negative results for contraband.

17. Case agents discussed with CHS1 regarding placing a phone call to the target's phone (414) 491-0916 to conduct a controlled purchase of a firearm and 25 grams of heroin. CHS1 advised case agents that CHS1 had already coordinated the transaction via phone prior to meeting with the case agents. CHS1 then provided a call history of his/her cell phone, where case agents then observed an outgoing call to target's phone number at approximately 11:31am. CHS1 advised case agents that the target informed him/her to arrive at the target's residence located at 5360 N. 38th Street, Milwaukee, Wisconsin.

18. Case agents provided CHS1 with $3,000.00 in pre-recorded U.S. currency to purchase a rifle and heroin from FERGUSON. CHS1 was advised by FERGUSON that the firearm would cost $1,500.00 in U.S. currency and the 25 grams of heroin would cost $1,500.00 in U.S. currency. Additionally, case agents provided CHS1 with an audio/visual recording device

and transmitter, which CHS1 was in possession of during the course of the controlled buy. Case agents advised assisting officers of the meet location for the controlled buy.

19. Following the installation of the recording equipment, CHS1 departed to FERGUSON's residence located at 5360 N. 38th St. Surveillance was maintained by case agents who followed CHS1 while maintaining visual contact. At approximately 12:05pm, CHS1 arrived and parked at FERGUSON's residence. Members of Milwaukee Police Department Special Investigations Division maintained visual observations of CHS1 and the rear door of the residence. CHS1 approached and knocked at the rear door. The surveillance team later observed FERGUSON make contact with CHS1, who then entered into the FERGUSON's residence.

20. At approximately 12:26pm, the surveillance team observed CHS1 exiting the residence with FERGUSON. CHS1 was later observed entering into his/her vehicle. Shortly after CHS1 was observed re-entering into FERGUSON's residence along with FERGUSON. At approximately 12:30pm CHS1 exited the residence and entered back into his/her vehicle, departing southbound in the alley. Case agents followed and maintained view of CHS1 to the predetermined meeting location.

21. At approximately 12:33pm, CHS1 and the case agents arrived at the meeting location. At approximately 12:35pm, case agents retrieved the rifle using latex gloves and a clear plastic sandwich bag containing a light tan chunky substance suspected to be heroin. Case agents then conducted a search of CHS1 and his/her vehicle with negative results for additional contraband.

22. CHS1 stated upon arriving at the target residence CHS1 parked his/her vehicle in the alley. CHS1 stated contact was made with FERGUSON via FaceTime. CHS1 advised he/she waited for FERGUSON to allow him/her into the rear door of the residence. CHS1 stated, upon

entering the residence, they walked into the basement. CHS1 stated they talked for a while and the CHS advised the target he/she wanted 25 grits. Case agents know from training and experience the term "grits" is street slang for grams.

23. CHS1 stated while he/she was in the basement he/she observed approximately 100 grams of heroin on the table. CHS1 stated the 100 grams of heroin was packaged in a bag and had the appearance of a block. CHS1 advised he/she was asked if he/she wanted the heroin "re-rocked". Case agents know from training and experience the term "re-rocked" is street slang for the process of diluting the powdered narcotics and re-forming the narcotic into a more stable shape. This process would also add more weight to the narcotic so the drug dealers could make more profit for diluted narcotics. CHS1 advised this process would take FERGUSON 10 minutes. CHS1 advised he/she then provided the target with $1500 in US currency and the target began repacking the requested 25 grams of heroin. CHS1 stated FERGUSON had a money counter in the residence that he attempted to use but it was not working properly. The CHS stated the target then began counting the money by hand. CHS1 stated FERGUSON then provided him/her with the heroin and the CHS1 inquired about the Kel-Tec rifle. CHS1 stated FERGUSON came to an agreement of $1,650.00 in US currency for the rifle.

24. CHS1 stated FERGUSON and himself/herself then walked outside towards the garage. CHS1 stated once inside the garage he/she observed ammunition and magazine for multiple caliber firearms. CHS1 stated that FERGUSON retrieved the rifle from the garage and placed it in a black bag. CHS1 then retrieved the bag and entered into his/her vehicle and left FERGUSON's residence.

25. Case agents then transferred the evidence to the Milwaukee FBI office. Case agents subjected a sample of the suspected heroin utilizing a Nark II 11 test, which tested

positive for opiates. Case agents then subjected a sample of the heroin utilizing a Nark II 33, which tested positive for Fentanyl with a total weight of 25g with packaging. The purchased firearm was observed to be a Kel-Tec SU-16 caliber 5.56mm black in color with Serial # NER16. The Kel-Tec was equipped with a 40-round black Magpul Pmag magazine with several rounds of 5.56mm.

26. Before April 15, 2025, FERGUSON had been convicted in the state of Wisconsin of Possess w/Intent-THC (<=200 grams), a class I felony, Wisconsin Statutes 961.41(1m)(h)1 (case no.: 2015CF000645); Possession of THC (2nd+ Offense) [Modifiers:961-2nd OR SUB], a class I felony, Wisconsin Statutes961.41(3g)(e), Possession of Cocaine/Coca(2nd+) [Modifiers: 961-2nd OR SUB] (case no.:2006CF002800); and Burglary-Building or Dwelling [Modifier: Party to a Crime], a class F felony, Wisconsin Statutes 943.10(1)(a) (case no.: 2003CF002944).

**FERGUSON's New Residence**

27. In the month of September 0f 2025 case agents interviewed CHS1. CHS1 advised case agents FERGUSON has moved into a new residence located at 2722 N Sherman Blvd. Milwaukee, Wisconsin. CHS1 advised case agents FERGUSON has moved into the residence with his new girlfriend. Law enforcement records revealed Michelle MULLINS (DOB: XX/XX/1982) is associated with the residence.

**Surveillance of FERGUSON at 2722 N. Sherman Blvd.**

28. On, November 18, 2025, case agents began static surveillance at the address of 2722 N. Sherman Boulevard, Milwaukee, Wisconsin (hereinafter TARGET PREMISES). The surveillance was regarding target Quentin FERGUSON (DOB: XX/XX/1986). During the course of the surveillance, case agents were able to maintain view of the rear entry door portion of the

residence, back yard, and rear parking slab. During the course of the surveillance conducted on FERGUSON between November 18th, 2025, and March 3rd, 2026, the following occurred:

**November 18, 2025**

a. 11: 00am – Case agents observed red in color 2013 Ford Flex 4 door vehicle bearing Wisconsin registration plate [ASH4529] parked in the rear driveway along with a white in color 2024 Volkswagen Tiguan bearing Texas registration plate [VTB7208].

b. 11:41am – A female suspected to be Michelle MULLINS (DOB: XX/XX/1982) is observed exiting the rear entry door of the target residence. MULLINS wore a gray shirt, gray pants, black sweater, and white shoes. MULLINS entered into the driver seat of the Volkswagen Tiguan. Shortly after FERGUSON was observed exiting the rear entry door to the target residence. FERGUSON was observed wearing a green camouflage jacket, blue jeans, tan boots, and black winter cap. FERGUSON appeared to be holding a plate of food and was then observed entering into the front passenger seat of the vehicle. The vehicle was then observed reversing out of the parking slab and then traveling in an unknown direction.

c. 2:03pm – The Volkswagen Tiguan was observed arriving and parking in the rear slab. FERGUSON was observed exiting the driver's door of the Volkswagen Tiguan and MULLINS exited the front passenger door. FERGUSON appeared to wave someone towards him. Both MULLINS and FERGUSON are then observed entering the rear entry door to the target residence.

d. 2:05pm – A red sedan parks in front of the garage south of the target residence. An unknown black male (hereinafter subject #1) wearing a red and black jacket, white cap, and green pants was observed walking into the back yard of the target residence.

Subject #1 appeared to knock on the rear entry door. Subject #1 was then observed opening the rear entry door and walked into the TARGET PREMISES.

e. 2:14pm – Subject #1 was observed exiting the rear entry door to the target residence. Subject #1 was observed holding a small white package containing a white in color substance in both hands. Subject #1 was then observed exiting the rear gate of the back yard and away from view. The red sedan was then observed reversing out of view. Due to the position of surveillance, case agents were not able to determine if the subject entered into the driver seat of the red sedan. Through case agents training and experience case agents suspected the small white package containing a white in color substance to be cocaine.

f. 2:37pm – FERGUSON was observed exiting the rear entry door to the TARGET PREMISES and was then observed attempting to allow the dog into the residence. FERGUSON held a black duffle bag that appeared to contain a long heavy object. FERGUSON placed the bag in the front passenger seat. FERGUSON then pulled a black rag out of his right pants pocket and placed it in the front passenger compartment. FERGUSON sat down in the front passenger seat of the vehicle. The vehicle reversed out of view. Based on training and experience, case agents suspect a rifle style firearm was contained within the bag.

**November 21, 2025**

g. 7:44am – FERGUSON exited the TARGET PREMISES while holding several packages in his hand containing a white substance and entered the Volkswagen. FERGUSON was wearing a black hair wrap, white t-shirt, and gray shorts. The vehicle then departed, traveling out of view.

h. 7:50am – The Volkswagen returned back to the parking slab. FERGUSON could be observed on the phone while twisting a clear sandwich bag containing a white chunky substance suspected to be cocaine. These sandwich bags appeared to be the same bags FERGUSON was observed exiting the residence with. Shortly after, a white in color vehicle could be observed slowly driving in front of FERGUSON. FERGUSON placed one bag containing suspected cocaine in the passenger seat while holding additional bags suspected to contain cocaine. FERGUSON placed the bags in his right front pocket and reached into the driver's floorboard. FERGUSON walked towards the alley to the suspected white vehicle that slowly traveled towards FERGUSON's vehicle's location. FERGUSON walked back towards the vehicle. FERGUSON then walked back out into the alley out of view in the direction of the vehicle initially involved in the transaction. FERGUSON walked back into the Volkswagen. FERGUSON retrieved the clear bag containing a white chunky substance suspected to be cocaine from the front passenger seat. The Volkswagen then departed the area traveling out of view.

**i.** 9:03am – The Volkswagen returned in the alley in front of the garage of the TARGET PREMISES. MULLINS exited the TARGET PREMISES while wearing a brown and white jacket, white shirt, and light-colored pants. MULLINS walked towards the passenger side of the Volkswagen. FERGUSON exited the driver's door of the Volkswagen holding onto clothes. It appeared FERGUSON was concealing a longer object with the clothes by the manner in which FERGUSON carried the object. FERGUSON walked back into the TARGET PREMISES while holding the object concealed by the clothes. Through training and experience case agents believe the

object FERGUSON was concealing with clothes was consistent with a rifle style firearm.

**November 23, 2025**

j. 9:23pm – The Volkswagen returned and reversed into the parking slab of the TARGET PREMISES. MULLINS exited the vehicle and retrieved a bag from the trunk. MULLINS then entered into the residence as FERGUSON stayed put in the driver's seat. FERGUSON appeared to be holding small bags containing an unknown substance. Due to the time of day, case agents were unable to determine the color of substance that were observed in the small bags. Through training and experience case agents believed these bags were consistent with the previously observed bags of suspected narcotics FERGUSON possessed. FERGUSON exited the vehicle and approached the trunk of the vehicle. MULLINS exited the TARGET PREMISES and approached the trunk of the vehicle. FERGUSON and MULLINS retrieved bags from the trunk of the vehicle and entered the TARGET PREMISES.

**November 24, 2025**

k. 7:16am - The Volkswagen arrived and parked in the rear parking slab of the TARGET PREMISES. FERGUSON exited the driver's door of the vehicle. FERGUSON exited the vehicle while holding two baggies containing white substances suspected to be cocaine. Each bag was consistent with the size of an ounce weight amount. FERGUSON opened the front passenger door and appeared to search the passenger compartment. FERGUSON entered into the side garage door. FERGUSON then exited the garage with an unknown black object and unlocked the rear entry doors to the TARGET PREMISES. FERGUSON walked into the TARGET PREMISES.

l. 8:54am – FERGUSON exited the TARGET PREMISES. FERGUSON wore a white in color short sleeve t-shirt, gray pants, and white cap. FERGUSON entered the driver's side door of the Volkswagen while holding a white bag containing white in color substance suspected to be cocaine in his left hand. The vehicle reversed and traveled out of view.

**November 28, 2025**

m. 8:42am – FERGUSON exited the rear entry door to the TARGET PREMISES while carrying a black garbage bag. FERGUSON also carried a book bag on his back. FERGUSON placed the book bag in the vehicle and then placed the garbage bag in the trunk of the vehicle. FERGUSON held a clear bag containing a white substance, which case agents suspect to be cocaine base. FERGUSON held the open bag near his face and then began to drive out of view.

n. 11:48am – The Volkswagen reversed into the parking slab of the TARGET PREMISES. FERGUSON held a bag containing a white substance suspected to be cocaine base on his lap. FERGUSON tied off the bag and placed it into his right pants pocket. FERGUSON placed the book bag on the center console. FERGUSON appeared to be placing items into the bag. FERGUSON exited the vehicle and walked to the rear entry door of the TARGET PREMISES.

**March 3, 2026**

o. 11:41am - A white in color 2013 Chevrolet Traverse bearing Illinois temporary tag [014626A43] arrived and parked in the garage of the TARGET PREMISES. FERGUSON exited the garage side door and entered the rear entry door to the TARGET PREMISES.

p. 11:47am – FERGUSON exited the rear entry door to the TARGET PREMISES. FERGUSON held a white shopping bag in his left hand while walking towards the garage side door. FERGUSON entered the garage and the Traverse could be observed reversing out of the garage and out of view.

q. 4:24pm – The Traverse parked in the garage of the TARGET PREMISES. FERGUSON and MULLINS exited the garage side door and walked towards the TARGET PREMISES. FERGUSON appeared to retrieve keys out of his front right pants pocket. During this time, FERGUSON turned towards MULLINS and case agents observed FERGUSON holding a digital gram scale along with an approximate half ounce of white in color substance, which case agents suspect to be cocaine powder. FERGUSON then unlocked the Chicago style door and rear entry door to the TARGET PREMISES utilizing the keys. Both FERGUSON and MULLINS then entered the TARGET PREMISES.

**Trash Cover Search**

29. On Monday, February 16, 2026, case agents conducted a trash cover at the TARGET PREMISES regarding Quentin FERGUSON's suspected narcotics trafficking. Three garbage bags were collected from trash receptacles placed in the alley for trash collection. This garbage was clearly abandoned with no expectation of privacy where the garbage receptacles were located.

30. Case agents examined the garbage at the Federal Bureau of Investigation Milwaukee Headquarters, located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235. During the examination the following items of evidentiary value were located:

| | | |
|---|---|---|
| Bag 1 | Item 8 | Four (4) twisted, corner cut/knotted clear plastic baggies. |
| Bag 2 | Item 2 | Two (2) plastic sandwich baggies |
| Bag 2 | Item 3 | Two (2) twisted, corner cut/knotted plastic clear baggies (one contained in clear plastic zip-lock bag) |
| Bag 3 | Item 1 | Five (5) plastic sandwich baggies |
| Bag 3 | Item 2 | One (1) plastic zip-lock bag |
| Bag 3 | Item 3 | Four (4) twisted, corner cut/knotted plastic baggies |

31. Based on case agents training and experience, the clear twisted corner-cut and knotted plastic bags are consistent with methods drug traffickers use to package and sell illicit narcotics. Specifically, within Bag 2, Item 3, the twisted/knotted clear baggie containing a powdery gray residue held within the clear plastic zip-lock bag, was subjected to a field narcotics test by case agents, using Mobile Detect narcotics field tests. The powdery gray residue presumptively tested positive for heroin, fentanyl, and methamphetamine.

**Traffic Stop / Pursuit Arrest of FERGUSON**

32. On March 7, 2026, at approximately 00:21 hours, West Allis Police Department officers attempted to conduct a traffic stop of a 2013 Chevrolet Traverse bearing Illinois temporary tag [014626A43] in the 800 block of S 84th Street, West Allis, Wisconsin. The vehicle failed to

stop, and subsequently, officers pursued it for approximately 14.04 miles until a PIT maneuver disabled it in the City of Brookfield, Wisconsin. The driver was removed from the vehicle, taken into custody, and identified as Quentin FERGUSON (DOB: XX/XX/1986) by his Wisconsin identification card. In FERGUSON's front right coin pocket of his jeans, officers located two folded pieces of paper containing a combined weight of 1.64 grams of a powdery substance. The powdery substance was presumptively tested utilizing a Fentanyl 33 Reagent Test, testing positive for fentanyl. 22.98 grams of suspected marijuana was located in a Sour Lemons zip bag in the driver's door map pocket. The suspected marijuana was presumptively tested utilizing the Duquenois-Levine Test, testing positive for the presence of tetrahydrocannabinol. A digital scale covered in white powder was located on the rear passenger seat floorboard area. Additionally, a "Blu" Products black flip phone (**TARGET DEVICE #1**) was located in the center console cup holder of vehicle, black iPhone smartphone located on the driver's seat floorboard of vehicle (**TARGET DEVICE #2**), and $1,090.00 were also located. The temporary plates and vehicle identification number identified the registered owner of the Chevrolet Traverse listing to Michelle A. Mullins at the address: 2722 N Sherman Blvd, Milwaukee, Wisconsin. FERGUSON was charged with the following charges, Vehicle Operator Flee/Elude Officer, 1st-Degree Recklessly Endangering Safety, and Possess w/Intent Manufacture/Deliver Fentanyl<10grams. During the booking process, FERGUSON provided the address, 2722 N Sherman Blvd, Milwaukee, as his home of record.

**Execution of Residential Warrant**

33. On March 23, 2026 at approximately 12:25pm the Honorable Stephen Dries, U.S. Magistrate Judge approved and signed search warrant for the residence of 2722 N. Sherman Bl., Milwaukee, WI 53210. On March 24, 2026 at approximately 6:00am the search warrant was

executed at the residential address of 2722 N. Sherman Bl., Milwaukee, WI 53210. During the course of the search warrant, the FBI swat team conducted a clear of the residence prior to the search team arriving on scene. The search team took control of the scene and began entry photos at approximately 6:42am.

34. Takela ROGERS (DOB: XX/XX/ 1982), Michelle MULLINS (DOB: XX/XX/1982), and a juvenile child were present at the residence. Prior to clearing the residence, FBI Crisis Negotiation Team attempted to call MULLINS approximately 13 times between 6:00am and 6:07am in attempt to limit the damage from the breach. MULLINS did not return any attempts to make telephonic contact. At approximately 6:10am, MULLINS exited the residence and was detained. The search team then conducted a search of the residence with the following evidence recovered:

a. Black portable blender – Item 1B141
b. Six corner cut bags, two straws, and two pill casings with a white powdery residue – Item 1B140
c. ATI 1911 .22 LR semi-automatic pistol (Serial # A478163) – Item 1B139
d. Black iPhone in case with pink back – Item 1B138
e. (24) .22 caliber cartridges and (2) .25 caliber cartridges – Item 1B137
f. (8) .22 caliber cartridges and (7) 5.56 caliber cartridges - Item 1B136
g. Blue and white capsules (suspected Duloxetine Hydrochloride) – Item 1B135
h. White oval pills (suspected methamphetamine) - Item 1B134
i. Blue and green capsules (Suspected Duloxetine Hydrochloride) - Item 1B133
j. Suspected Methamphetamine (Total Package Weight 37.9g) - Item 1B132
k. Unknown white substance - Item 1B131

l. Miscellaneous Ammunition, (12) 7mm cartridges, (9) 300 blackout cartridges, (45) 32-30 cartridges, (43) 5.56 cartridges, (1) 10mm cartridges, (12) .22 LR cartridges, (4) 9mm cartridges, (2) .25 auto cartridges, (2) .40mm cartridges, (17) .380 cartridges, (54) 12 gauge shells, and (3) .38 special cartridges – Item 1B130

m. Magazine with approximately (10) .22 caliber cartridges - Item 1B129

n. Anderson Manufacturing AR-15 .223 caliber rifle painted resembling "Nerf" gun (Serial # 19205046) - Item 1B128

o. Blue Line Solutions M-15 .22 caliber rifle (Serial # BL78170) - Item 1B127

p. Buprenorphine and Naloxone sublingual film 8mg/2mg foil packets floating in the bathroom toilet along with a gray grocery bag located on the floor near the toilet – Photo'd only.

32. Evidence was seized, documented, and photographed prior to being collected. Items seized during the search warrant were document on a FD-597 (FBI Receipt for Property Form). At approximately 8:39am, FBI released the scene to Takela Rogers.

## CONCLUSION

35. FERGUSON is known to use a cellular phone to discuss and arrange illicit narcotics transactions. Upon West Allis department conducting a search incident to arrest of the vehicle used in the vehicle pursuit, the officers found **TARGET DEVICE # 1 and TARGET DEVICE # 2** in the vehicle. Based on the facts detailed above, the **TARGET DEVICE # 1 and TARGET DEVICE # 2** not only appeared to belong to FERGUSON, but it also appeared to have been in use for an extended period of time. Based on the recovery of the firearms during the course of the executed search warrant conducted on FERGUSON's residence, your affiant has found it

incredibly common for suspects who possess firearms legally or illegally to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the firearms that they control, possess, buy and sell. Furthermore that these photographs and visual depictions are typically kept and maintained on their cellular devices, that affiant has also found it incredibly common for crime suspects to use cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain firearms. Accordingly, based on training, experience, and the above information derived from this investigation, your Affiant believes FERUSON used the **TARGET DEVICE # 1 and TARGET DEVICE # 2** to facilitate drug and firearm trafficking, and thus evidence of drug and firearm trafficking may be stored and recorded on the **TARGET DEVICE # 1 and TARGET DEVICE # 2**.

36. Through my training, experience, and discussions with other experienced law enforcement officers, your Affiant is familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

37. Based upon my training and experience, your Affiant knows that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers and co-conspirators in the distribution of controlled substances. Your Affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

38. Based on my training and experience, your Affiant is aware that individuals involved in trafficking controlled substances often possess a cellular device to compartmentalize their illegal activity and to avoid law enforcement detection.

39. Based upon my training and experience, your Affiant believes it is common for crime suspects who possess illegal controlled substances to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances involved in drug trafficking. Furthermore, your Affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

40. Based upon the facts described above, to include (1) my knowledge of and experience confirming the prolific use of electronic devices to facilitate the possession and trafficking of controlled substances and firearms; (2) FERGUSON's arrest in connection with the recent distribution of illicit controlled substances; and (3) "Blu" Products black flip phone (i.e., the **TARGET DEVICE # 1**) and black iPhone smartphone (i.e., **TARGET DEVICE # 2**) having been recovered from FERGUSON's vehicle, there is probable cause to believe that a search of the information contained within the above described **TARGET DEVICE # 1** and **TARGET DEVIDE # 2** will produce evidence of a crime, namely evidence related to conspiracy to possess with intent to distribute and to distribute controlled substances, possession with intent to distribute and distribution of controlled substances, and the unlawful use of a communication facility to facilitate the distribution of controlled substances.

41. The **TARGET DEVICE # 1** and **TARGET DEVICE # 2** was seized by the West Allis Police Department during the arrest of FERGUSON (i.e., Pilgrim Road/ Grandview Drive, Brookfield, Wisconsin 53005) on March 7, 2026.

42. The **TARGET DEVICE # 1** and **TARGET DEVICE # 2**, currently listed under Milwaukee FBI Inventory No. 1B125 (TARGET DEVICE # 1) and No. 1B126 (TARGET DEVICE # 2), is in storage at the Federal Bureau of Investigation Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in the Eastern District of Wisconsin. In my training and experience, your Affiant knows that **TARGET DEVICE # 1 and TARGET DEVICE # 2** has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE # 1 and TARGET DEVICE # 2** first came into the possession of the FBI.

43. Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICE # 1** and **TARGET DEVICE # 2** described in Attachment A to seek the items described in Attachment B.

**TECHNICAL TERMS**

44. Based on my training and experience, your Affiant uses the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

45. Based on my training, experience, and research, your Affiant knows that the **TARGET DEVICE # 1** and **TARGET DEVICE # 2** has the capabilities that allow it to serve as

a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

46. Based on my knowledge, training, and experience, your Affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

47. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICE # 1** and **TARGET DEVICE # 2** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE # 1** and **TARGET DEVICE # 2** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

48. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit the examination of the **TARGET DEVICE # 1** and **TARGET DEVICE # 2** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET DEVICE # 1** and **TARGET DEVICE # 2** to human inspection in order to determine whether it is evidence described by the warrant.

49. *Manner of execution.* Because this warrant seeks only permission to examine the device once in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

---

## ATTACHMENT A

**Property to Be Searched**

The property to be searched is described as follows: an "Blu" Products flip phone currently listed under Milwaukee FBI Inventory No. 1B125, hereinafter referred to as the **TARGET DEVICE # 1**, and a Black iPhone smartphone, currently listed under Milwaukee FBI Inventory No. 1B126, hereinafter referred to as the **TARGET DEVICE # 2**.

**TARGET DEVICE** #1 and **TARGET DEVICE #2** are currently located at the Federal Bureau of Investigation Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in the Eastern District of Wisconsin. This warrant authorizes the forensic examination of **TARGET DEVICE** #1 and **TARGET DEVICE #2** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **TARGET DEVICE #1** and **TARGET DEVICE #2**, described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1) (i.e., the Subject Offenses), and involve Quentin FERGUSON, including, but not limited to:

   a. any documents and communications related to the Subject Offenses;

   b. lists of contacts and related identifying information;

   c. any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording schedule or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records;

   f. photographs and/or videos depicting evidence of the Subject Offenses;

   g. any evidence related to either the ownership, purchase, or possession of items used in the Subject Offenses;

   h. records of internet activity, including browser history, search terms that the user entered into any internet search engine, and records of user-typed web addresses

2. Evidence of user attribution showing who used or owned **TARGET DEVICE #1** and **TARGET DEVICE #2** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.